IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| KIRK J. LUDLOW, | ) | |
| | ) | |
| Plaintiff, | ) | 4:12CV3113 |
| | ) | |
| v. | ) | MEMORANDUM AND ORDER ON |
| | ) | DEFENDANT'S MOTION FOR |
| BNSF RAILWAY COMPANY, a | ) | SUMMARY JUDGMENT |
| Delaware corporation, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

On or about May 16, 2012, Kirk J. Ludlow filed a complaint alleging that BNSF Railway Company (BNSF) terminated his employment in violation of the Nebraska Fair Employment Practice Act (NFEPA), Neb. Rev. Stat. § 48-1101 et seq., and in violation of public policy. (See Notice of Removal, Ex. 1, Compl., (hereinafter "Compl."), ECF No. 1-1.) Now before me is BNSF's motion for summary judgment. (ECF No. 62). For the following reasons, BNSF's motion will be granted in part.

## I.   BACKGROUND

Ludlow was hired by BNSF on June 26, 1998, as a Crew Support Technician. (Def.'s Br., Statement of Undisputed Material Facts (hereinafter "Def.'s Facts") ¶ 1, ECF No. 63.) In November 2000, Ludlow was promoted to Claims Representative, and in 2005 he was promoted to Senior Claims Representative. (Def.'s Facts ¶¶ 2-3, ECF No. 63.) He was stationed in Alliance, Nebraska, from 2005 until his termination on July 29, 2010. (Def.'s Facts ¶¶ 3, 13, ECF No. 63. See also Pl.'s Br.,

1

Pl.'s Statement of Facts (hereinafter "Pl.'s Facts") ¶ 1, ECF No. 68.)  At relevant times, Ludlow's direct supervisor was Claims Manager Barry Wunker, who was stationed in Gillette, Wyoming.  (Pl.'s Facts ¶ 2, ECF No. 68.)  Wunker reported to William Renney, Director of General Claims, who was stationed in Billings, Montana.  (Id.)  Renney reported to Dennis Cannon, General Director of Claims, who in turn reported to Rick Lifto, Assistant Vice President of the General Claims Department.  (Id.)  Lifto reported to Charles Shewmake, Vice President and General Counsel of BNSF.  (Def.'s Index, Ex. C, Shewmake Dep. at 4, ECF No. 64-4; Def.'s Reply Index, Ex. M., Lifto Dep. at 17, ECF No. 73-5.)

In 2007, Larry Fernandes began working for BNSF as a claims representative trainee.  (Pl.'s Facts ¶ 3, ECF No. 68.)  As a retired member of the United States armed forces, Fernandes was eligible for–and evidently received–job training benefits under the G.I. Bill.  (Id.)  Ludlow was the "certifying official" for Fernandes' job training program.  (Id.)

After Fernandes completed the job training program, John Streedbeck of the Department of Veterans Affairs (VA) performed a compliance survey.  (Pl.'s Facts ¶ 4, ECF No. 68; Pl.'s Index, Ludlow Aff. ¶ 5, ECF No. 69-1.)  On September 1, 2009, Streedbeck informed Ludlow that Fernandes' job training benefits should have ended when Fernandes received a promotion approximately eight months after he began his employment at BNSF.  (Pl.'s Index, Ludlow Aff. ¶ 5, ECF No. 69-1.)  Streedbeck also gave Ludlow two documents related to Fernandes's status in the VA job training program.  (Id.)[1]  Ludlow discovered that someone had forged his

---

[1] According to an Executive Summary prepared by Brian Williams of the BNSF Police Department, these documents stated that Fernandes had not been promoted during his two years in the VA job training program.  (Def.'s Index, Ex.

signature on these documents.  (Id. ¶¶ 5-7.)

In 2009, BNSF's Code of Conduct required all employees to report "actual and apparent violations of the law."  (Pl.'s Index, Ex. M, ECF No. 69-2.)   It also prohibited "[r]etaliation for the good faith reporting of an apparent or actual violation of the law."  (Pl.'s Index, Ex. N, ECF No. 69-2.)  All exempt employees at BNSF were required to certify annually that they knew of no unreported violations of the law.  (Pl.'s Index, Ex. AG, Whitlock Dep. at 12-14, ECF No. 69-2.)

In September 2009, Ludlow reported the forgery to Wunker, (e.g., Pl.'s Index, Ex. AH, Wunker Dep. at 33, ECF No. 69-2), adding that he thought Fernandes might be responsible for it, (id. at 41-42).  Wunker confirmed with Ludlow that the VA was aware of the issue.  (E.g., Pl.'s Index, Ex. O at 2-3, ECF No. 69-2; Def.'s Reply Index, Ex. P, Wunker Dep. at 40-41, ECF No. 73-8.)  However, Wunker did not discuss Ludlow's report with his superiors–or anyone else–during the fall of 2009.  (Pl.'s Index, Ex. AH, Wunker Dep. at 70-71, ECF No. 69-2.)

On or about April 19, 2010, Ludlow sent a packet of information about the forgery to Brian Williams of BNSF Resource Protection in Denver, Colorado.  (Pl.'s Index, Ex. H, ECF No. 69-2; Pl.'s Index, Ex. AJ, Williams Dep. at 6-7, ECF No. 69-2.)  I note in passing that BNSF Resource Protection is also called the "BNSF Police" or "asset protection."  (E.g,  Pl.'s Index, Ex. AJ, Williams Dep. at 6, ECF No. 69-2; Pl.'s Index, Ex. P, ECF No. 69-2; Pl.'s Facts ¶ 7, ECF No. 68; Def.'s Index, Ex. G, ECF No. 64-8.)  On April 20, 2010, Ludlow notified Wunker that the packet had been sent to Williams.  (Pl.'s Index, Ludlow Aff. ¶ 16, ECF No. 69-1.)  Wunker instructed Ludlow to meet with him on the following day (i.e., April 21, 2010) in Douglas,

---

G, ECF No. 64-8.)

Wyoming, to discuss the packet.  (Id.  See also Def.'s Response to Pl.'s Facts ¶ 8, ECF No. 72.)  Wunker admits that the time of this meeting, he was frustrated that Ludlow "elevated" the packet without telling him, and he was concerned that he could be subject to discipline for failing to report Ludlow's allegation of forgery to his superiors.  (Pl.'s Index, Ex. AH, Wunker Dep. at 141, 144-46, ECF No. 69-2.)  It is undisputed, however, that Wunker was never disciplined for failing to report the alleged forgery.  (See Def.'s Index, Ex. C, Shewmake Dep. at 26, ECF No. 64-4; Pl.'s Index, Ex. AK, Renney Dep. at 29-35, ECF No. 69-2.)

On April 21, 2010, Renney wrote an email to Cannon stating, in part, as follows:

> I need to bring a situation to your attention.
>
> Our Alliance office is in disarray.
>
> Last week I was notified by Barry Wunker that there has been a blow up in the Alliance office with Kirk and Larry yelling at one another.  Our HR representative in Alliance had walked by the office and overheard the yelling. . . .
>
> I instructed Barry to get to the bottom of it while he was in trial last week with Larry Fernandes.
>
> Here is what I have learned so far.
>
> •   Larry Fernandes was the recipient of VA funds issued to retired military personnel who take a job and are in training.  I am told Kirk Ludlow signed the forms as supervisor.
> •   We promoted Larry from trainee to full claims representative.
> •   He continued to receive funds.
> •   Kirk Ludlow took great umbrage that Larry continued to

4

get funds when he was no longer a trainee and filed a
written complaint with the VA.

- The VA sent Larry a bill for $7,000.00 for monies not
  entitled.

- Larry met with the VA and explained how we are always
  in training; they rescinded their request for repayment and
  offered him more money.

- This did not satisfy Kirk Ludlow so he wrote to assets
  protection accusing Larry Fernandes of fraud and forgery.

Brian Williams received the packet from Kirk Ludlow yesterday.
. . .

I have spoken with Brian Williams and he has stated what he sees
so far is a very upset if not jealous employee (Kirk Ludlow). The BNSF
is not a victim. The VA has vindicated Larry Fernandes. Kirk Ludlow
does not want to let this go.

. . . .

Barry Wunker is meeting with Kirk Ludlow today and I will fill
you in on what I learn.

(Pl.'s Index, Ex. P, ECF No. 69-2.) Although Renney's letter states that Williams
found Ludlow to be "a very upset if not jealous employee," Williams has testified that
he made no such statements to Renney. (Pl.'s Index, Ex. AJ, Williams Dep. at 20,
ECF No. 69-2.) On the contrary, Williams states that he did not believe that Ludlow
had an improper motive for making his allegations of forgery. (Id.) Moreover,
Williams prepared an executive summary dated April 22, 2010, wherein he wrote, "At
this time it appears that a forgery did in fact take place, however BNSF Railway is not
the victim." (Def.'s Index, Ex. G at 2, ECF No. 64-8.)

On April 22, 2010, Ludlow received a letter from Wunker stating,

This letter is in follow up to our afternoon meeting in Douglas,

5

> WY on April 21, 2010 and the packet of information that you sent that
> was received at my Gillette office on the same date.  During the meeting
> you produced what appeared to be an identical copy of the same packet
> and we discussed the contents of it and your contention that Larry
> Fernandes forged your name for personal gain with great specificity.
>
> As we discussed this is a serious charge that will be elevated
> accordingly.  As of this writing I have shared the contents of the packet
> and discussed the situation with Bill Renney and Dennis Cannon.  In
> addition to your notification of Resource Protection this matter has also
> been conveyed to Human Resources for additional investigation and
> handling.
>
> Now that these departments have been appraised [sic] of the
> situation I must request that you stand down.  This is a formal request
> that you immediately cease and desist with any further investigation or
> pursuit of this matter as an employee of or on behalf of BNSF.  Your
> involvement should now be limited to cooperation with Human
> Resources and Resource Protection, if and when they ask for it.

(Pl.'s Index, Ex. I, ECF No. 69-1.  See also Pl.'s Index, Ludlow Aff. ¶ 18, ECF No.

69-1.)  Copies of this letter were sent to Renney, Cannon, and Patty Whitlock, who

was BNSF's Director of Human Resources.  (Pl.'s Index, Ex. I, ECF No. 69-1.)

Wunker also called Ludlow and told him that if state or federal officials contact him

about the forgery, he must direct those officials to Renney.  (Pl.'s Index, Ludlow Aff.

¶ 19, ECF No. 69-1.)  Ludlow understood Wunker's oral and written instructions to

mean that his superiors were prohibiting him from speaking with any state or federal

official about the forgery without Renney's permission, and he believed that his

instructions "carried an implicit threat of termination . . . for insubordination" if he

contravened them.  (See id. ¶ 20.)

On May 14, 2010, Streedbeck called Ludlow and advised him that the VA was

still investigating the forgery.  (Pl.'s Facts ¶ 13, ECF No. 68.)   Ludlow told

Streedbeck that he could not speak with him any further and directed him to Renney. (Id.)

On May 17, 2010, Ludlow emailed a memorandum to Wunker (with copies to Renney, Cannon, and Whitlock) describing his telephone conversation with Streedbeck. (Pl.'s Index, Ex. I, ECF No. 69-1.) Ludlow's memorandum states, in part, as follows:

> Friday I received a call from Mr. John Streedbeck with the Department of Veterans Affairs. I want you to know that I did not solicit this telephone call. I want to make it clear that there was no contravention on my part regarding the Cease and Desist order issued to me in your letter dated April 22, 2010. I want you to be aware of the information that he provided to me.

> Mr. Streedbeck said that he recently became aware of the investigation, regarding the overpayment of education benefits, being dropped by the St. Louis office. The investigation was dropped because someone decided that a misunderstanding of the benefits caused the situation. He does not agree with that and has reopened the matter. He stated that Mr. Fernandes will be required to pay the monies back. Mr. Fernandes will still have an opportunity to appeal the decision.

> Additionally, he stated that there is no possibility that the forged signatures occurred at the Veterans Association. He requested an update from his Supervisors regarding the forgery issue and told me that the matter has been elevated to the VA's Office of the Inspector General in Washington D.C.

> I believe there is a good likelihood that I will be asked to answer questions and asked for cooperation by State and Federal officials. I do not wish to contravene the Cease and Desist order and seek your permission to cooperate. I await your guidance regarding this matter.

> I want to let you know that I have experienced absolutely no trouble treating Mr. Fernandes with the utmost respect and dignity while

7

> these investigations transpire.  However, the situation creates an amount of internal uneasiness due to the seriousness of the criminal act and the possible ramifications to me and my family.  I want you to know that I will be seeking a move where I can distance myself from the perpetrator of a crime that has victimized me.  I am not satisfied and do not agree that damages have not befallen me when I know that Mr. Fernandes has access to my SSN; knowing he has forged my signature on more than one occasion; and knowing that we live in a time where identity theft is a terrible and real problem.  I plan to talk with my wife and family as I look at Claims Manager opportunities that become available in the future.

(Id.)

In response to Ludlow's memorandum, Whitlock sent an email dated May 19, 2010, to Wunker (with copies to Renney and Cannon) stating,

> Sorry it took me awhile to get with you on this. . . .  I suggest you call Kirk and thank him for updating us on the status of the complaint . . . .  Further, assure Kirk that it is certainly our expectation that he fully cooperate with the VA [in] their investigation.  In addition, let him know that he needs to copy Brian Williams from Resource protection, who is also working with the VA, on any correspondence or development in the investigation.  Then document the conversation.

(Pl.'s Index, Ex. Q, ECF No. 69-2.)

Later that day, Wunker forwarded to Renney a copy of Whitlock's email along with a paragraph stating,

> As you know I've already given Kirk directions on this but wanted to run by you before replying to Patty.  I told Kirk that you had all of the details as previously given and that if these gentlemen still need to talk to Kirk after talking to you that it would be up to you and would likely want to do so in a conference.  Kirk said that Streedbeck and Dirksen do not have the "package" he sent to us and the ROC.  I say this is the best way to cooperate as suggested by Patty otherwise Kirk will continue to throw gas on the fire . . . which, based on Kirk's latest letter, may have even occurred in his last conversation he had

8

w/Streedbeck.  Kirk's conversation with Streedbeck may have already
exceeded our directive to stand down.

(Pl.'s Index, Ex. Q, ECF No. 69-2.)

Wunker replied to Whitlock's email (with copies to Renney and Cannon) on

May 20, 2010.  (Pl.'s Index, Ex. R at 2, ECF No. 69-2.)  His reply states,

> Patty,
> I responded to Kirk on this a couple hours before you commented
> yesterday.  After discussing with Bill Renney, I verbally asked Kirk to
> continue to fully comply with the cease and desist.  I told Kirk to refer
> any additional contact from the VA or other investigators to Bill
> Renney.  If Bill cannot satisfy their questions with the extensive
> information that Kirk has already provided than [sic] Bill will arrange
> a conference with Kirk, himself, and the investigator.  This way we can
> fully cooperate and yet keep Kirk's involvement focused on FACTS and
> not the "criminal" which, based on his latest letter, Kirk clearly feels is
> guilty until proven innocent.

(Id.)

On May 19, 2010, Renney sent Williams an email stating, "If possible we

would like to put closure to the investigation into allegations of forgery by Kirk

Ludlow against Larry Fernandes.  Please let me know if your department intends to

investigate this allegation any farther."  (Pl.'s Index, Ex. S at 2, ECF No. 69-2.)  Later

that day, Renney was informed by email that an investigator from the U.S. Inspector

General's Office was "looking into this as a criminal matter."  (Id. at 1.)  On May 20,

2010, Renney sent an email to Streedbeck and Brad Dirksen, who was the state

official responsible for the administration of the VA's training program, stating,

> A serious allegation has been made against one of my employees
> Mr. Laurence Fernandes.  The allegations are being made by another of
> my employees Kirk Ludlow.
>
> John I left you a brief message on this.

I will be out of the office next week but would like to let you two know about the dynamics of what is really going on.

In brief:

Mr. Ludlow does not like Mr. Fernandes.  He is trying to get him in trouble any way he can.  When it did not work internally he has taken his crusade externally.  Some of the issues are:

- Mr. Ludlow has told Mr. Fernandes that he is a slacker because during the 20 years of Military service, Mr. Fernandes never tried to become an officer.
- Mr. Ludlow considers Mr. Fernandes a liar because he once said he was of the Catholic faith and yet was not aware of the function of the Knights of Columbus.
- Mr. Ludlow has alleged fraud against Mr. Ferndandes for checking Hispanic on his employment application with the railroad when in fact he is Portuguese.

Hence I have a real personnel problem that I am dealing with.  [O]ur offices are being "used" by Mr. Ludlow.

As to whether Mr. Fernandes is in training, he is.  I am at present training him to take the next level that of "Senior Claims Representative."

As to the allegation of forgery, the two signatures in question are very scribbly.  However I think they are in fact Mr. Ludlow's. There are several patterns that are identical.  Of note Mr. Ludlow suffers from seizures following a serious motorcycle accident.  He served in the guard but had to leave due to seizures.

I hope this email to you gives you clearer understanding of the matter at hand.

Mr. Fernandes is an exemplary employee.  We like to hire from the military and in this case we found a very good employee.

10

(Pl.'s Index, Ex. T, ECF No. 69-2.)[2]

An email dated June 21, 2010, from Renney to Lifto (with a copy to Cannon) states that Renney had "thought about officing Kirk Ludlow in the shops." (Pl.'s Index, Ex. U, ECF No. 69-2.) It appears that sometime later, Ludlow was directed to move his office to the shops, and Ludlow began making arrangements for the move sometime on or before June 30, 2010. (E.g., Pl.'s Index, Ex. W, ECF No. 69-2.) Ludlow considered "moving to the shop[s] to be punishment." (Pl.'s Index, Ex. AI, Ludlow Dep. at 170, ECF No. 69-2.) Since Ludlow's termination, no claims officer has had his or her office located in the shops. (Pl.'s Index, Ex. AK, Renney Dep. at 201, ECF No. 69-2.)

On July 13, 2010, Ludlow was involved in an incident with Mary Adamson, a cleaning service contractor. (See, e.g., Def.'s Index, Ex. B, ECF No. 64.3.) According to Adamson's deposition testimony, she and Ludlow were talking about Adamson's shirt, which had the word "Move" on it, when Ludlow "said something about some kind of kick." (Pl.'s Index, Ex. AL, Adamson Dep. at 6, ECF No. 69-2.) Ludlow then fell on the floor while attempting to do a kick. (Id.) As he fell, one of Ludlow's feet hit the side of Adamson's head and knocked her glasses to one side. (Id.) The kick caused Adamson to suffer a headache. (Id. at 6, 10.) Ludlow jumped up and apologized, and Adamson felt that the incident was an accident. (Id. at 7.)

---

[2] BNSF claims that this "email never reached Mr. Streedbeck because Mr. Renney used an incorrect email address." (Def.'s Reply Br. at 18, ECF No. 72.) An email address listed on Exhibit T does appear to include a misspelling of Streedbeck's name; however, BNSF has not referred me to evidence showing that the email address was incorrect or that the email never reached Streedbeck. Also, I note that the email indicates on its face that its contents were addressed in a separate "brief message" that Renney left for Streedbeck. BNSF does not dispute that Renney's email did reach Dirksen.

She added that Ludlow was not kicking toward her, but when he fell his "[l]egs went everywhere." (Id. at 9. See also id. at 23.)

On July 16, 2010, Fernandes sent an email to Wunker stating, in part, as follows:

> The following was told to me yesterday . . . . I again questioned Mary today at 5PM, to confirm details.
>
> I was outside our building chatting with Frank Mentley [sic] and Mary Abrams [sic]. Frank is the supervisor in charge of our contracting cleaning group. Mary is a cleaning person here.
>
> Frank asked me if I heard about what happened between Mary and Kirk Ludlow. I said no.
>
> Mary then relayed the following story:
> Earlier in the week, she made a gesture to Kirk in a joking manner. Kirk performed a kick toward Mary. His foot made contact on the side of her head in the temple and nose and knocked her glasses off. Kirk fell to the ground.
>
> I asked when this occurred. She said Tuesday 7/13/2010 when depositions were going on. . . .
>
> Mary stated her glasses were knocked off and she had a headache. She stated Joshua Garner, a former Roadmaster, was here for depositions and witnessed the event. He came up out of his chair and asked if she was ok. She stated he came very close to hitting his head on the table and splitting it open.
>
> I asked Mary if she was alright and she said yes. She said she had a splitting headache after the event and that night. She did not seek medical treatment. She said her husband Leroy was very upset following this episode.
>
> Frank appeared upset by the event and said "somebody should do

12

something."

> Notes:
> I am not attesting to the validity of this episode. I am just relaying
> what was said. This episode sounds "suspicious and far fetched." But,
> I would be remiss in my duties if I did not report it.

(Pl.'s Index, Ex. X at 3, ECF No. 69-2.) Some of the information contained within Fernandes' email is contradicted by the testimony of other witnesses. For example, Francis Mentele testified that he did not discuss this incident with Fernandes; that Fernandes overheard Mentele talking about the incident with Adamson "and evidently he reported it"; and that Mentele could not recall expressing any anger during the conversation. (Pl.'s Index, Ex. AM, Mentele Dep. at 7-9, ECF No. 69-2.) Mentele also testified that he did not ever report the incident, he did not know Fernandes was going to report the incident, and he did not ask Fernandes to report the incident. (Id. at 13-14.) Like Mentele, Adamson testified that Fernandes "walked out" while she and Mentele were discussing the incident. (Pl.'s Index, Ex. AL, Adamson Dep. at 19, 23, ECF No. 69-2.) She also testified that her glasses were not knocked off by the kick, she did not have problems with her head later that evening, and she had no recollection of mentioning whether her husband was upset after the incident. (Id. at 6, 10, 19.)

Also on July 16, 2010, Williams informed Ludlow that he would be interviewed by someone from the Inspector General's office regarding the forgery investigation. (Pl.'s Index, Ludlow Aff. ¶ 23, ECF No. 69-1.) Later that day, Special Agent Todd Jourdan of the Office of the Inspector General contacted Ludlow and scheduled an interview. (Id.)

On July 19, 2010, at 8:35 am, Whitlock sent an email to Wunker stating, "Just spoke with Josh. Sounds like it was horseplay. No anger on either part Kirk

apologized." (Pl.'s Index, Ex. Z, ECF No. 69-2.) At 8:58 that morning, Wunker forwarded Whitlock's email to Renney with a message stating, "I found this in my inbox right after we hung up. We need to conference with Patty . . . ." (Id.) At 11:25, Wunker sent Renney an email stating, "Patty Whitlock is now planning to go to Alliance immediately. She spoke with her leadership, Travis DeVault and Steve Klug. They requested that she go down to speak with Kirk and Mary Adamson in person. Patty related to me that Klug expressed concern over the potential that this would potentially rise to 'violence in the workplace[.']" (Pl.'s Index, Ex. AA, ECF No. 69-2.)

During the afternoon of July 19, 2010, Ludlow informed Wunker via email that he would meet with Investigator Jourdan to discuss the forgery. (Pl.'s Index, Ex. Y, ECF No. 69-2.) Wunker forwarded Ludlow's email to Renney at 4:19 pm on July 19, 2010. (Id.)

On July 20, 2010, Adamson gave a statement to Whitlock about the incident with Ludlow. (Pl.'s Index, Ex. AL, Adamson Dep. at 24-25, ECF No. 69-2.) During her deposition, Adamson testified initially that when she gave her statement to Whitlock, "Patty said this had nothing to do with Kirk getting fired." (Id. at 24.) On cross-examination, Adamson was confronted with Ludlow's termination notice (which indicated that Ludlow was terminated on the 29th of July), and she admitted that she continued to see Ludlow around the office "for maybe a week after" giving her statement. (Def.'s Reply Index, Ex. J, Adamson Dep. at 25-26, ECF No. 73-2.) Although Adamson continued to maintain that she "distinctly" remembered "somebody" telling her that "it had nothing to do with Kirk's getting fired," she agreed that "the dates don't really match up," and she conceded that she could not remember who made the statement. (Def.'s Reply Index, Ex. J, Adamson Dep. at 25-

14

26, ECF No. 73-2.)  Ludlow relies on Adamson's testimony to show that the kicking incident was a pretext for his termination.  (E.g., Pl.'s Response Br. at 27, ECF No. 68.)  BNSF counters that Adamson's testimony cannot be considered in opposition to its summary judgment motion because it is inadmissible hearsay.  (Def.'s Reply Br. at 6-7, ECF No. 72.)  I agree with BNSF that to the extent that the statement is offered as proof that the kicking incident "had nothing to do" with Ludlow's termination, the statement is inadmissible hearsay, and it will be stricken from the summary judgment record.

On July 21, 2010, Wunker emailed Renney a recommendation that Ludlow be terminated for kicking Adamson.  (Pl.'s Index, Ex. AB, ECF No. 69-2.)  Later that day, Renney forwarded Wunker's email to Cannon and wrote, "I concur with Barry's recommendation to terminate the employment of Kirk Ludlow." (Pl.'s Index, Ex. AC, ECF No. 69-2.)  On July 22, 2010, Cannon forwarded Wunker's and Renney's emails to Lifto, along with a statement expressing his concurrence in their recommendations.  (Id.)

On July 27, 2010, Renney sent an email to Lifto stating,

I have concerns regarding Kirk Ludlow's stability.

- On August 24, 2009 I was meeting with Kirk Ludlow and going over his status report.  I inquired about his process of negotiations to which he exploded with expletives, finger pointing, gesticulating and yelling.  He settled down once confronted.  It was a totally inappropriate response to my inquiry.
- According to Barry Wunker, Kirk Ludlow has accused Larry Fernandes of:
    - Being a liar for listing Hispanic on his employment application.  Larry is Portugese.
    - Lying about being a Catholic as he purported to not

15

know much about the Knight's [sic] of Columbus.
- Being a slacker in the Military because he never tried to become an officer in his 20 years of full time service in the Navy.

- Most recently on July 20, 2010 Kirk kicked a female contract janitor in the side of the head.  It appears there was no anger and was horseplay.

- Barry Wunker has reported that Kirk is working very odd hours, appears to be losing weight and is often passive/aggressive.

(Pl.'s Index, Ex. AD, ECF No. 69-2.)  Ludlow admits that he kicked Adamson in the side of the head and that he was working odd hours - - though he claims that his job often required him to work odd hours. (Pl.'s Index, Ex. AI, Ludlow Dep. at 176-79, ECF No. 69-2.)  He denies the remaining allegations appearing in Renney's email to Lifto, (e.g., id. at 178-179), and the parties agree that there is no documentation corroborating the alleged encounter between Renney and Ludlow in August 2009, (e.g., Pl.'s Index, Ex. AK, Renney Dep. at 177-79, 183-85, ECF No. 69-2).

On July 28, 2010, Shewmake, Lifto, Cannon, Renney, Wunker, and Larry Stroke, who was an attorney in BNSF's law department, held a conference call to discuss Ludlow's termination. (Def.'s Index, Ex. C, Shewmake Dep. at 5-9, ECF No. 64-4.)  Shewmake states that the decision to terminate Ludlow was his, and he made his decision based on the information he obtained during the conference call. (Def.'s Index, Ex. C, Shewmake Dep. at 9, 26-27, ECF No. 64-4.)  He claims, however, that when he made his decision, he was not aware that Wunker and Renney had recommended Ludlow's termination. (Def.'s Index, Ex. C, Shewmake Dep. at 17-18,

16

ECF No. 64-4.)  Also, although Wunker "brought up" the VA investigation during the call, Shewmake states that he had "already made [his] decision" by that time. (Pl.'s Index, Ex. AF, ECF No. 69-2; Def.'s Index, Ex. C, Shewmake Dep. at 14-16, ECF No. 64-4.)  Shewmake adds that he did not learn about the forgery allegation until the instant lawsuit was filed.  (Def.'s Index, Ex. C, Shewmake Dep. at 14, ECF No. 64-4.)

When asked during his deposition why Ludlow's conduct warranted termination, Shewmake testified as follows:

> We are on a journey where we are holding our employees accountable for their actions.  We are going to - - we are in the process of building a complete company where we have a culture of compliance with our rules.  And, eventually, we are going to get to a place where we have commitment with our rules.  And I really believe that and the Claims Department, by virtue of its role, is there to resolve claims when, among other things, employees are injured.
>
> So, Mr. Ludlow, if he was somebody who is engaging in this kind of horseplay, roughhouse behavior, kicking people, falling down in the workplace, then an employee were to come in and say, you know, I want to resolve this claim where I stubbed my toe, well, we are going to hold Mr. Ludlow to the same kind of accountability that we are going to expect him to hold people to.
>
> So we did view this as - - I am not sure that I would ever view kicking somebody in the head as not serious.  But it was certainly inconsistent with the direction that we were trying to move our department.

(Def.'s Index, Ex. C, Shewmake Dep. at 16-17, ECF No. 64-4.  See also id. at 27.) Shewmake added that he wanted to "put this into context" and find out whether the kicking incident was "a one-time occurrence," or whether there had "been some other inappropriate behavior in the workplace."  (Pl.'s Index, Ex. AO, Shewmake Dep. at

12, ECF No. 69-2.) Shewmake was then told "that there had been some inappropriate conduct, a lack of restraint back when [Ludlow] was a clerical employee," and there was "another incident involving Mr. Renney or in Mr. Renney's presence that was . . . very heated." (Id. at 12-13.) Based on the information he received during the call, Shewmake concluded that the kicking incident "was not the first instance of inappropriate behavior in the workplace," (id. at 13), and that Ludlow should be terminated, (id. at 15).

Ludlow claims, however, that the incident that occurred while he was a clerical employee "did not involve a lack of restraint on [his] part"; rather, Ludlow made a formal complaint that he was suffering harassment from a co-worker based on his religion and military service. (Pl.'s Index, Ludlow Aff. ¶ 29, ECF No. 69-1.) Also, as noted previously, Ludlow denies engaging in a "heated" exchange with Renney, (see id.), and there is no record that such an incident occurred, (see, e.g., Pl.'s Index, Ex. AK, Renney Dep. at 177-79, 183-85, ECF No. 69-2).

There is evidence indicating that BNSF failed to follow its own policy when terminating Ludlow's employment. According to Whitlock, Ludlow was covered by an Exempt Performance Management Policy at the time of his termination. (Pl.'s Index, Ex. AG, Whitlock Dep. at 73-74, ECF No. 69-2; Pl.'s Index, Ex. AE, ECF No. 69-2.) The policy states,

> Any employee who is not meeting overall expectations for the position, or demonstrates a specific skills deficiency or a specific non-constructive behavior, may be placed on a performance improvement plan. The company however, reserves the right to discipline an employee, including to terminate the employment of the employee, without a performance improvement plan, if approved by the Vice President of Human Resources & Medical or Executive Vice President or designee.

18

(Pl.'s Index, Ex. AE, ECF No. 69-2.)  There is no evidence the Ludlow was placed on a performance improvement plan prior to his termination, but the record does support an inference that Shewmake made the decision to terminate Ludlow without the approval of the "Vice President of Human Resources & Medical or Executive Vice President or designee."[3]

In a letter dated July 29, 2010, Renney informed Ludlow that his employment was being terminated, effective immediately, due to the incident with Adamson "reviewed in light of prior meetings with [Renney] and other Claim Department supervisors" during which Ludlow "demonstrated lack of restraint that is

---

[3] Although it argued in its opening brief that "Shewmake made the decision to terminate Plaintiff and it was his decision alone," (Def.'s Facts ¶ 7), BNSF argues in its reply brief that "Edward McFalls, Assistant Vice President for Human Resources and Diversity, was designated by Vice President [of] Human Resources and Medical, Linda Longo-Kazanova, to discipline and terminate exempt employees in July 2010," and McFalls "concurred with Mr. Ludlow's termination," (Def.'s Reply Br. at 23-24, ECF No. 72).  In his affidavit, McFalls states that he "was aware of and was a party to discussions regarding Mr. Ludlow's continued employment with BNSF," but he does not claim specifically that he was a party to the conference call when Shewmake decided to terminate Ludlow.  (Def.'s Reply Index, Ex. S, McFalls Aff. ¶ 3.)

I note in passing that McFalls also claims that the Exempt Performance Management Policy "does not apply to instances where BNSF needs to take employment action for misfeasance such as what occurred in the case involving Kirk Ludlow."  (Id. ¶ 2.)  This claim is somewhat in tension with Whitlock's testimony that the policy did apply to Ludlow, and at this stage of the proceeding I must view the summary judgment record in a light favorable to the plaintiff and draw all reasonable inferences in his favor.

In short, for present purposes I conclude that there is a genuine issue whether Ludlow was covered by the Exempt Performance Management Policy and whether BNSF complied with the policy when terminating Ludlow's employment.

inappropriate for an employee of BNSF Railway." (Pl.'s Index, Ex. L, ECF No. 69-1.) It appears that Ludlow had not yet spoken with Investigator Jourdan when his employment was terminated.

After his termination, Williams escorted Ludlow to his car. (Pl.'s Index, Ex. AI, Ludlow Dep. at 65-66, ECF No. 69-2.) Ludlow said that he was going to hire an attorney because "this is retaliation," and Williams responded, "you got it." (Id.) Ludlow interpreted Williams' comment to mean that he thought Ludlow was correct. (Id. at 66.) Williams testified, however, that he does not recall implying that Ludlow was suffering retaliation. (Def.'s Reply Index, Ex. R, Williams Dep. at 38, ECF No. 73-10.)

On or about May 11, 2011, Ludlow filed a charge of discrimination with the Nebraska Equal Opportunity Commission (NEOC). (Def.'s Index, Ex. D, ECF No. 64-5.) He filed an amended charge of discrimination on or about June 22, 2011. (Def.'s Index, Ex. E, ECF No. 64-6.) On February 24, 2012, the NEOC made a "no reasonable cause" determination and advised Ludlow of his right to file an action in state district court within 90 days of his receipt of the determination. (Def.'s Index, Ex. I, ECF No. 64-10.)

On or about May 16, 2012, Ludlow filed a two-count complaint against BNSF in the District Court of Box Butte County, Nebraska. (Compl, ECF No. 1-1.) Count I alleges that Ludlow was terminated in retaliation for "lawfully oppos[ing] the fraud conducted by Mr. Fernandes on BNSF property, and in the name of [Ludlow] as representative of BNSF," and for "lawfully refus[ing] to carry out BNSF's instructions to not cooperate with any investigation by the VA into the forgery issue," in violation of the NFEPA. (Id. ¶¶ 27-30.) Count II alleges that he was terminated in violation of public policy after he "rightfully reported, opposed, and refused to

participate in illegal activity while employed by BNSF."  (Id. ¶¶ 32-34.)

BNSF removed the action to this court on June 8, 2010, (see generally Notice of Removal, ECF No. 1), and it filed the instant motion for summary judgment on April 12, 2013, (see Mot. for Summ. J., ECF No. 62).

## II.   STANDARD OF REVIEW

"A party may move for summary judgment, identifying each claim or defense–or the part of each claim or defense–on which summary judgment is sought." Fed. R. Civ. P. 56(a).  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Id.  A "material" fact is one that "might affect the outcome of the suit under the governing law," and a genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). See also Jones v. Minnesota Dept. of Corrections, 512 F.3d 478, 481 (8th Cir. 2008).  In determining whether a genuine issue of material fact exists, the evidence is to be taken in the light most favorable to the nonmoving party, Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970), and the court must not weigh evidence or make credibility determinations, Anderson, 477 U.S. at 249.

It is the moving party's burden to establish that no genuine issue of material fact exists.  Fed. R. Civ. P. 56(a); Adickes, 398 U.S. at 157.  Therefore, if the moving party does not meet its initial burden, summary judgment must be denied even if no affidavits or other evidence have been submitted in opposition to the motion.  See Adickes, 398 U.S. at 159-60.  When the nonmoving party bears the burden of proof on a particular issue at trial, however, the moving party may be able to discharge its

initial burden merely by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986).  After the moving party has met its burden, "the non-moving party may not rest on the allegations of his pleadings, but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." <u>Singletary v. Missouri Dept. of Corrections</u>, 423 F.3d 886, 890 (8th Cir. 2005).

## III.   ANALYSIS

BNSF submits that it is entitled to summary judgment on both counts of Ludlow's complaint.  (<u>See generally</u> Def.'s Br., ECF No. 63.)  I shall analyze each of BNSF's arguments in turn.

### A.   Whistleblower Retaliation in Violation of the Nebraska Fair Employment Practice Act

BNSF argues that it is entitled to summary judgment on Ludlow's NFEPA claim because: 1) "No independent private cause of action exists for whistleblower retaliation under the [NFEPA]," 2) Ludlow cannot show that he engaged in protected activity, 3) Ludlow "cannot establish a causal connection between his allegedly protected activity and his termination," and 4) Ludlow cannot show that BNSF's legitimate, non-retaliatory reason for terminating his employment was a pretext. (<u>See</u> Def.'s Br. at 8-16, ECF No. 63.)

1.   <u>Private Right of Action Under the NFEPA</u>

BNSF argues first that "[t]he FEPA does not expressly provide for a private judicial right of action for those individuals claiming to be aggrieved by an employer's unlawful employment practices"; that "[t]he only instance where an individual may claim a private right of action under the FEPA is where the alleged

22

violation of the FEPA is asserted not as the sole cause of action, but as the basis for a claim under Neb. Rev. Stat. § 20-148, which creates a civil cause of action for the violation of rights secured by the Constitution and laws of the State of Nebraska"; and that therefore the "[p]laintiff's claim cannot arise under the FEPA unless that claim is also secured by the Constitution and laws of the State of Nebraska." (Def.'s Br. at 8, ECF No. 63 (citations omitted).)

At one time, the NFEPA did not provide individuals with a means of initiating a private right of action. See, e.g., Goolsby v. Anderson, 549 N.W.2d 153, 157 (Neb. 1996) ("It is true that the Nebraska Fair Employment Practice Act in existence at the time Goolsby's cause of action arose did not explicitly provide a private cause of action to parties alleging violations under the act."). This is no longer the case, however. See Neb. Rev. Stat. §§ 48-1119(3); 48-1120.01. A plaintiff can now bring a claim under the NFEPA itself, e.g., Hohn v. BNSF Ry. Co., 707 F.3d 995, 1000 (8th Cir. 2013) (citing Neb. Rev. Stat. § 48-1120.01), or he can invoke section 20-148 to bring a claim without first exhausting the NFEPA's administrative remedies, see Goolsby, 549 N.W.2d at 156-58; Parrish v. Immanuel Medical Center, 92 F.3d 727, 734 (8th Cir. 1996). Ludlow completed the administrative process before filing his complaint, and he need not invoke section 20-148 to pursue his claim.[4]

2.    Protected Activity

BNSF argues next that Ludlow cannot establish a prima facie case of whistleblower retaliation under the NFEPA. (See Def.'s Br. at 9-13, ECF No. 63.)

---

[4] I note in passing that BNSF appears to have retracted its argument; it now claims that it only meant to argue "that any claim advanced by the Plaintiff pursuant to the FEPA must comply with all of the requirements of the FEPA because this claim is a statutory cause of action." (Def.'s Reply Br. at 24, ECF No. 72.)

To establish a prima facie case, a plaintiff must show that (1) he was engaging in a protected activity, (2) he suffered an adverse employment action, and (3) there was a causal link between the protected activity and the adverse employment action. E.g., Helvering v. Union Pacific R.R. Co., 703 N.W.2d 134, 147-152 (Neb. App. 2005). BNSF maintains that Ludlow cannot satisfy the first of these elements because he "cannot establish that BNSF engaged in an unlawful practice or that it demanded Mr. Ludlow do any unlawful act." (Def.'s Br. at 10, ECF No. 63.)  It also claims that Ludlow cannot satisfy element three because there is no "causal connection between his allegedly protected activity and his termination." (Id. at 12.)

I turn first to the question of whether Ludlow can establish the first element of a prima facie case. The NFEPA prohibits an employer from discriminating against one of its employees because the employee "has opposed any practice or refused to carry out any action unlawful under federal law or the laws of this state." Neb. Rev. Stat. § 48-1114(3). "Seen in the context of the entire act and in light of the apparent purposes the act is meant to serve, the [term] 'practice' in § 48-1114(3) refers to an unlawful practice of the employer." Wolfe v. Becton Dickinson & Co., 662 N.W.2d 599, 603 (Neb. 2003). See also id. ("The statute's purpose is not served by giving an extra layer of protection from discharge to those employees who happen to voice their opposition to any manner of unlawful activity."). "The evil addressed by § 48-1114(3) is the exploitation of the employer's power over the employee when used to coerce the employee to endorse, through participation or acquiescence, the unlawful acts of the employer." Id. at 604. Thus, to satisfy the first element of a prima facie case under § 48-1114(3), an employee must show that he either opposed "an unlawful practice of the employer" or refused "to honor an employer's demand that the employee do an unlawful act." Id.

24

The record shows that Ludlow had a reasonable, good faith belief that Fernandes committed forgery. See Wolfe, 662 N.W.2d at 605 ("[A]n employee is protected by FEPA from employer retaliation for his or her opposition to an act of the employer only when the employee reasonably and in good faith believes the act to be unlawful."). The record also shows that Ludlow opposed Fernandes' alleged forgery. There appears to be no dispute, however, that because Fernandes was not Ludlow's "employer," Ludlow's opposition to Fernandes' actions cannot support a prima facie case of whistleblower retaliation. See Wolfe, 662 N.W.2d at 603-04 (holding that the NFEPA does not protect employees who oppose the alleged illegal drug use of coworkers when the employer had no involvement in the drug use, did not endorse the drug use, and did not even have a reliable report that drug use was occurring). (See also Pl.'s Response Br. at 20-22, ECF No. 68 (acknowledging that § 48-1114(3) protects employees' opposition to unlawful acts of their employer).)

Ludlow argues that the first element of his prima facie case is satisfied, however, because he opposed BNSF's attempts to obstruct justice in violation of state and federal law. Specifically, he argues that "BNSF, by and through its managers," violated 18 U.S.C. § 1512 and Revised Statutes of Nebraska § 28-919 "by threatening, intimidating, and harassing Ludlow with intent to prevent the communication of information related to the commission of a federal offense." (Pl.'s Response Br. at 21, ECF No. 68.) Section 1512 states, among other things, that "[w]hoever intentionally harasses another person and thereby hinders, delays, prevents, or dissuades any person from . . . reporting to a law enforcement officer . . . the commission or possible commission of a Federal offense . . . ; [or] . . . causing a criminal prosecution . . . to be sought or instituted, or assisting in such prosecution or proceeding; or attempts to do so, shall be fined under this title or imprisoned not

25

more than 3 years, or both."  18 U.S.C. § 1512(d)(2), (4).  In pertinent part, section 28-919 states, "A person commits the offense of tampering with a witness or informant if, believing that an . . . investigation of a criminal or civil matter is pending or about to be instituted, he or she attempts to induce or otherwise cause a witness or informant to . . . [w]ithhold any testimony, information, document, or thing."  Neb. Rev. Stat. § 28-919(1)(b).

The record includes evidence indicating that Wunker, Renney, and Cannon conspired in an attempt to dissuade Ludlow from 1) reporting the possible commission of a federal offense to federal investigators, 2) causing a criminal prosecution to be sought or instituted, and 3) assisting in such prosecution.  It is also reasonable to infer from the record that Wunker, Renney, and Cannon ordered Ludlow to "stand down" from the investigation under threat of termination for insubordination.  In short, there is a genuine issue whether Wunker's,  Renney's, and Cannon's conduct was "at least . . . of a type that is unlawful" under 18 U.S.C. § 1512.  Wolfe, 662 N.W.2d at 606.  Similarly, because there is evidence that Wunker, Renney, and Cannon attempted to prevent Ludlow from providing information to persons investigating the forgery (and did so with knowledge that the investigation was pending or imminent), there is a genuine issue whether the trio engaged in the type of conduct prohibited by § 28-919.

BNSF argues that there is no precedent suggesting that "an alleged violation of criminal law by employees of a company can be considered an unlawful practice of the employer."  (Def.'s Reply Br. at 26, ECF No. 72.)  It is true that in Wolfe, the Nebraska Supreme Court held that the plaintiff failed to establish a prima facie case of whistleblower retaliation when 1) "[t]he only unlawful act he allege[d] [was] illegal drug use by [the defendant's] employees," and 2) there was no allegation that

26

the defendant was involved in or endorsed their drug use. 662 N.W.2d at 604. As noted previously, <u>Wolfe</u> supports the conclusion that Fernandes' alleged forgery cannot provide a basis for Ludlow's § 48-1114(3) claim against BNSF. <u>See also</u> <u>Bonn v. City of Omaha</u>, 814 N.W.2d 114 (Neb. App. 2012). Ludlow's obstruction of justice theory is not based on allegations of illegal conduct by mere coworkers, however. Nor is it based on alleged unlawful conduct that is unrelated to his employment. Rather, Ludlow has produced evidence that BNSF's Claims Manager and higher ranking supervisors agreed to give Ludlow formal orders that implicate state and federal witness tampering laws. <u>Wolfe</u> is distinguishable, I am not persuaded that the actions of Wunker, Renney, and Cannon cannot be attributed to BNSF.

BNSF also argues that "a fundamental problem with Plaintiff's theory is that it effectively would allow any employee in Nebraska to attempt to enforce alleged violations of the criminal law under the guise of a FEPA retaliation theory." (Def.'s Reply Br. at 26, ECF No. 72.) BNSF continues,

> No support whatsoever exists for such a vast expansion of the scope of the anti-retaliation provisions of the FEPA. At bottom, the purpose of the FEPA is to make sure an employer cannot abuse its authority over an employee to require that employee to participate or acquiesce in the employer's unlawful acts. Extending the scope of the FEPA as Plaintiff advocates would transform a FEPA retaliation theory into an all-encompassing general statutory tort unmoored from the actual purposes of the Act.

(<u>Id.</u> at 26-27 (citation omitted).) It seems to me, however, that Ludlow's claim squarely implicates "[t]he evil addressed by § 48-1114(3)." <u>Wolfe</u>, 662 N.W.2d at 604. Viewed in a light favorable to the plaintiff, the record shows that BNSF exploited its power over Ludlow by coercing him to acquiesce in its demands that he

27

not assist in a criminal investigation, which is the type of wrongdoing prohibited under 18 U.S.C. § 1512 and Revised Statutes of Nebraska § 28-919.  I do not see how Ludlow's claim expands the scope of the NFEPA into a mechanism for "enforc[ing] alleged violations of the criminal law under the guise of a FEPA retaliation theory." (Def.'s Reply Br. at 26, ECF No. 72.)  Nor do I see how his claim transforms "FEPA retaliation . . . into an all-encompassing general statutory tort unmoored from the actual purposes of the Act." (Id. at 27.)  Put simply, Ludlow's allegations that BNSF engaged in employment actions toward him that were unlawful, and then retaliated against him for refusing to acquiesce, fall within the reach of the NFEPA.

Somewhat relatedly, BNSF argues that if Ludlow's claim is allowed to proceed, courts will be forced to confront "complicated legal and factual issues" such as "whether the alleged actions of the employee are fairly attributable to the employer and within the scope of the employee's employment." (Id.)  As I noted above, however, this case does not hinge on allegations of forgery by a coworker, but on formal instructions from supervisors ordering a subordinate to cease pursuing, assisting in, or providing information in connection with a pending or imminent criminal investigation.  Because Ludlow's claim appears to fall within the literal scope of § 48-1114(3), the possibility that hypothetical future cases might be more "complicated" does not convince me that Ludlow's claim must fail as a matter of law.

Finally, NBSF denies that the actions of Wunker, Renney, "or anyone else with BNSF actually violated 18 U.S.C. § 1512 or Neb. Rev. Stat. § 28-919." (Def.'s Br. at 27, ECF No. 72.)  More specifically, BNSF argues that Wunker and Renney acted "not to prevent the VA from investigating or to prevent Mr. Ludlow from reasonably participating in such an investigation," but "to serve the complementary purposes of allowing the VA to continue its investigation based on the information already

provided to the VA by Mr. Ludlow, but to distance Mr. Ludlow from direct participation in the investigation because of his obvious biases against Mr. Fernandes." (Id.) It adds that "Mr. Wunker and Mr. Renney reasonably concluded that Mr. Renney could be the point person for the VA investigation and that any further information needed by the VA from Mr. Ludlow could be provided in a dispassionate manner based on facts, and not Mr. Ludlow's rank speculation, if Mr. Ludlow's contact with the VA was facilitated by Mr. Renney." (Id. at 27-28. See also id. at 28 (citing evidence that Ludlow would be allowed "to have a discussion with the investigator" if Renney could not answer the investigator's questions himself, and arguing that "no one at BNSF precluded Mr. Ludlow from speaking to Todd Jourdan").)

The record includes evidence supporting BNSF's position, and the trier of fact may well credit that evidence. When the record is viewed in a light favorable to Ludlow, however, it seems to me that a reasonable trier of fact could also reject BNSF's position. For example, a jury might reasonably conclude that the notion that Renney was chosen to assist with the investigation "in a dispassionate manner based on facts" is undermined by Renney's May 20, 2010, communications with Streedbeck and Dirksen. (Pl.'s Index, Ex. T, ECF No. 69-2.) More specifically, although BNSF's own Resource Protection officer issued a report concluding that a forgery occurred, (see Def.'s Index, Ex. G, ECF No. 64-8), Renney's email includes attempts to persuade the investigators that Ludlow was on a "crusade" to get Fernandes "in trouble any way he can," and that the disputed signatures actually belonged to Ludlow.[5] Moreover, there is evidence that Ludlow did not have an improper motive

_____

[5] As noted in Part I, Renney also stated in his email to the investigators that Ludlow was "us[ing]" the investigators to harm Fernandes, and he suggested that

in pursuing the forgery matter, and a reasonable trier of fact could conclude, based on the evidence currently in the record, that Renney had no intention of facilitating any investigation of the forgery–either with or without involvement from Ludlow. Also, BNSF's claim that Ludlow already provided his information to the VA is contradicted by evidence indicating that Ludlow did <u>not</u> provide his packet of information to Streedbeck.  (<u>See</u> Pl.'s Index, Ex. Q, ECF No. 69-2.)  In short, the facts relied upon by BNSF to show that Renney and Wunker did not violate witness tampering statutes are genuinely disputed.[6]

In summary, Ludlow has produced evidence that BNSF used its power over him to attempt to dissuade him from assisting with a federal forgery investigation; that BNSF's conduct is of the type that is prohibited under 18 U.S.C. § 1512 and Revised Statutes of Nebraska § 28-919; and that Ludlow opposed BNSF's conduct by seeking his supervisor's permission to speak with investigators, and, after being told to continue to refer all investigators to Renney, scheduling an interview with Investigator Jourdan despite the "cease and desist" orders.  The evidence is sufficient to establish the first element of a prima facie case under § 48-1114(3).

3.    The Causal Connection Between Protected Activity and Ludlow's Termination

BNSF argues next that Ludlow cannot establish the third element of a prima

_____

Ludlow's seizure disorder was somehow noteworthy.  (Pl.'s Index, Ex. T, ECF No. 69-2.)

[6] I note in passing that BNSF admits that it sought to "distance" Ludlow "from direct participation" in the investigation by having Renney "facilitate[]" Ludlow's contacts with the VA.  (Def.'s Reply Br. at 27, ECF No. 72.)  Insofar as this distancing and "facilitation" was intended to cause Ludlow to withhold certain information from the investigators, the facts admitted by BNSF may well implicate the witness tampering statutes.

facie case of whistleblower retaliation (i.e., that there is a causal connection between his protected activity and his termination) because Shewmake made the decision to terminate Ludlow's employment while "unaware of Mr. Ludlow's complaints about Mr. Fernandes and the Veterans Administration." (See Def.'s Br. at 11-13, ECF No. 63.)

Preliminarily, I must resolve the parties' dispute about whether a plaintiff must show merely that his "employer" was aware of his protected activity, or whether he must show that the particular person who decided to terminate him was aware of his protected activity. (See Def.'s Br. at 12-13, ECF No. 63; Pl.'s Response Br. at 23-25, ECF No. 68; Def.'s Reply Br. at 29-30, ECF No. 72.)

The Nebraska Supreme Court has held that "[a] prima facie case of retaliatory discharge of an employee consists of a discharge following a protected activity of which the employer was aware." Wolfe v. Becton Dickinson & Co., 662 N.W.2d 599, 604 (Neb. 2003) (emphasis added). BNSF takes the position that "employer," in this context, means the relevant decision-maker. (See Def.'s Reply Br. at 29-30, ECF No. 72.) Although I am aware of no authority addressing whether a plaintiff can establish a prima face case under § 48-1114(3) absent evidence that the relevant decision-maker was aware of the protected activity, BNSF does cite authority holding that a plaintiff cannot establish the "causal connection" element of a Title VII retaliation claim in the absence of such evidence. (See Def.'s Reply Br. at 30, ECF No. 72 (citing, inter alia, Jackson v. United Parcel Service, Inc., 548 F.3d 1137, 1143 (8th Cir. 2008)).) It is well-established that the NFEPA "is patterned from" Title VII, and therefore "it is appropriate to look to federal court decisions construing similar and parent federal legislation" when analyzing the NFEPA. E.g., Helvering v. Union Pacific R.R. Co., 703 N.W.2d 134, 146 (Neb. App. 2005). Therefore, I agree with

BNSF that Ludlow cannot establish a prima facie case merely by showing that supervisors who were not decision-makers were aware of his protected activity.

BNSF has submitted evidence that Shewmake made the decision to terminate Ludlow's employment based primarily on Ludlow's incident with Adamson. It has also submitted evidence that Shewmake made his decision without knowing that 1) Wunker, Renney, and Cannon had recommended Ludlow's termination; 2) Ludlow was assisting in a VA investigation; or 3) Ludlow had reported Fernandes' forgery. (E.g., Def.'s Index, Ex. C, Shewmake Dep. at 5-9, 14-18, 26-27, ECF No. 64-4; Pl.'s Index, Ex. AF, ECF No. 69-2.) This evidence is essentially uncontroverted; therefore, I find that there is no genuine issue that Shewmake made the decision to terminate Ludlow without knowing of Ludlow's protected activity.

In response, Ludlow argues that his protected activity was the true cause of his termination, and that Shewmake was used as an unwitting "cat's paw." (Pl.'s Response Br. at 30-31, ECF No. 68.) "'[C]at's paw' refers to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." Qamhiyah v. Iowa State Univ. of Sci. & Tech., 566 F.3d 733, 742 (8th Cir. 2009) (quoting EEOC v. BCI Coca-Cola Bottling Co. of L.A., 450 F.3d 476, 484 (10th Cir. 2006)). The cat's paw theory allows an employer to be held liable "under certain circumstances . . . where the formal decisionmaker is not the person who harbored an unlawful motive to terminate the employee." Id. (quoting Dedmon v. Staley, 315 F.3d 948, 949 n.2 (8th Cir. 2003)). More specifically, "[t]his circuit's 'cat's paw' rule provides that an employer cannot shield itself from liability for unlawful termination by using a purportedly independent person or committee as the decisionmaker where the decisionmaker merely serves as the conduit, or vehicle, or

rubber stamp by which another achieves his or her unlawful design." Id. (quoting Richardson v. Sugg, 448 F.3d 1046, 1060 (8th Cir. 2006)).

In Stacks v. Southwestern Bell Yellow Pages, Inc., 27 F.3d 1316 (8th Cir. 1994), the Eighth Circuit held that liability can be attributed to an employer when the actual decision-makers rely on facts that "have been filtered by a manager determined to purge the labor force of women." Qamhiyah, 566 F.3d at 743 (quoting Stacks, 27 F.3d at 1323). In support of its holding, the court noted that "where the immediate supervisor was 'closely involved in the decision-making process at each step,' it was 'of little consequence' that the immediate supervisor did not 'pull the trigger.'" Id. at 743 (quoting Stacks, 27 F.3d at 1323). Similarly, in Kramer v. Logan County School Dist. No. R-1, 157 F.3d 620 (8th Cir. 1998), the court held that the cat's paw theory was properly submitted to the jury when a teacher "present[ed] evidence that her principal and superintendent had engaged in discriminatory conduct toward her, had initiated the action that led to the non-renewal of her contract, and had 'made material misrepresentations and omissions in presenting their recommendation to the board.'" Qamhiyah, 566 F.3d at 743 (quoting Kramer, 157 F.3d at 624). Conversely, the cat's paw theory is not available when there is no evidence that the supervisor harboring the unlawful motive exercised any influence or leverage over the decision to terminate the employee. See id. at 743-45 (discussing Lacks v. Ferguson Reorganized Sch. Dist R-2, 147 F.3d 718 (8th Cir. 1998); Dedmon v. Staley, 315 F.3d 948 (8th Cir. 2003); Richardson v. Sugg, 448 F.3d 1046 (8th Cir. 2006)).

I find that when the record is viewed in a light favorable to Ludlow, there is a genuine issue whether Shewmake was used as a cat's paw to shield BNSF from liability for terminating Ludlow in retaliation for his involvement in the forgery investigation. The "cease and desist" order issued by Wunker was the product of

discussions between Wunker, Renney, and Cannon.  Within two days after Ludlow informed Wunker of his scheduled meeting with Investigator Jourdan, these same three managers issued recommendations that Ludlow be terminated.  Although Shewmake states that he was unaware of these recommendations, it is undisputed that Shewmake made his decision to terminate Ludlow based on the information provided to him by Wunker, Renney, Cannon, and Lifto.  A reasonable factfinder could conclude that Wunker, Renney, and Cannon were determined to see Ludlow terminated based on his involvement in the forgery matter, and that Renney made material misrepresentations about two other incidents involving Ludlow in order to convince Shewmake that the kicking incident was not a one-time occurrence.  The record also includes evidence indicating that on the day prior to the conference call, Renney sought to influence Lifto by emailing him concerns about Ludlow's "stability." (Pl.'s Index, Ex. AD, ECF No. 69-2.)  Furthermore, the record shows that Ludlow's kicking of Adamson was not reported or "elevated" by Adamson or Mentele, but rather by Fernandes, Wunker, and Renney–each of whom was interested in closing the forgery investigation.  In short, there is evidence that the same supervisors who allegedly engaged in the unlawful conduct opposed by Ludlow 1) were responsible for initiating the process of Ludlow's termination, 2) participated in the meeting to determine whether Ludlow should be terminated, and 3) influenced other meeting participants (i.e., Lifto and Shewmake) to favor terminating Ludlow by presenting them with false, misleading, or incomplete information.

BNSF argues that the cat's paw theory is inapplicable in this case because "the undisputed evidence . . . reveals that Mr. Shewmake actually made the decision and was not influenced by any alleged biases by any of his subordinates." (Def.'s Reply Br. at 35, ECF No. 72.)  More specifically, BNSF emphasizes that Shewmake's

34

deposition shows that "he made the decision to terminate Mr. Ludlow's employment during the conference of July 28, 2010," that "he did so without soliciting any recommendations from any of his subordinates," and that his decision was "based on [Ludlow's] clearly inappropriate workplace conduct on July 13, 2010, in the context of Mr. Shewmake's perceptions of [Ludlow's] earlier inappropriate behavior." (Id.) It adds that "there is simply insufficient evidence to establish any allegedly biased subordinate actually controlled Mr. Shewmake's termination decision." (Id. (citing Qamhiyah, 566 F.3d at 742-45).)

BNSF's description of Shewmake's testimony is accurate, but I am not persuaded that the cat's paw theory is not viable in the absence of evidence that a biased subordinate "actually controlled" the termination decision. See Qamhiyah, 566 F.3d at 743 (noting that the allegedly biased subordinate need not "pull the trigger" to establish the employer's liability (quoting Stacks, 27 F.3d at 1323)). There is evidence that the July 28, 2010, conference call would not have occurred but for the actions of Wunker, Renney, and Cannon. Moreover, despite Shewmake's testimony that he did not obtain recommendations from these allegedly biased subordinates, it is undisputed that Shewmake based his decision on the information that he received from them, and there is evidence that their information contained misrepresentations intended to persuade Shewmake to terminate Ludlow.

In summary, although there is evidence that Shewmake made an independent decision to terminate Ludlow without having knowledge of Ludlow's protected activity, there is also evidence that subordinates seeking to close the forgery investigation initiated the process to terminate Ludlow, participated in the decision-making process, filtered the information that was presented to Shewmake, and made misrepresentations and/or omissions to influence the decision. See Kramer, 157 F.3d

at 624; <u>Stacks</u>, 27 F.3d at 1323.  I find that there is a genuine issue whether Ludlow's termination was caused by his protected activity.

4.    Pretext

BNSF argues next that even if Ludlow is able to establish a prima facie case under § 48-1114(3), BNSF has articulated a legitimate, non-retaliatory reason for terminating Ludlow's employment.   (Def.'s Br. at 13, ECF No. 63.)   I agree. Specifically, BNSF has come forward with evidence that it terminated Ludlow not because of his involvement in the forgery investigation, but because he engaged in inappropriate workplace behavior (i.e., kicking Adamson in the head coupled with two prior instances of inappropriate conduct).  In light of this evidence, Ludlow must establish "that the legitimate reason offered by the defendant was but a pretext for [retaliation]."  <u>Helvering v. Union Pacific R.R. Co.</u>, 703 N.W.2d 134, 147 (Neb. App. 2005).

I find that Ludlow has come forward with evidence sufficient to support a reasonable inference that BNSF had a retaliatory motive for terminating his employment.  As noted previously, Ludlow's termination followed very closely after his disclosure that he was scheduled to meet Investigator Jourdan, and there is evidence that Shewmake was used as a cat's paw by supervisors who were motivated to terminate Ludlow due to his continuing involvement in the forgery investigation. Thus, there is a genuine issue whether BNSF's reasons for terminating Ludlow were a pretext for unlawful retaliation.[7]

---

[7] Ludlow also argues that his termination was not consistent with BNSF's Exempt Performance Management Policy, which demonstrates pretext.  It is true that in some instances, an employer's failure to adhere to its own policies "may support an inference of pretext."  <u>Rahlf v. Mo-Tech Corp., Inc.</u>, 642 F.3d 633, 639 (8th Cir. 2011) (quoting <u>Floyd v. State of Missouri Dep't of Social Services, Div.</u>

In reply, BNSF argues that the cat's paw theory is inapplicable in this case. (See Def.'s Reply Br. at 34-35, ECF No. 72.)  For the reasons set forth in Part III.A.3 above, I find that there is sufficient evidence to raise a genuine issue as to whether Shewmake served as the conduit through which biased subordinates were able to carry out unlawful retaliation.  In other words, the fact that there is no evidence demonstrating "any retaliatory motive by Mr. Shewmake," (Def.'s Br. at 14, ECF No. 63), does not mean that BNSF is absolved of liability, see Qamhiyah, 566 F.3d at 742.

BNSF also argues that Ludlow cannot establish pretext because there is no evidence that a similarly situated employee who did not engage in protected conduct was treated more favorably by BNSF.  (Def.'s Br. at 14-15, ECF No. 63.)  Evidence of this nature may indeed be used to demonstrate pretext, e.g., Lake v. Yellow Transp., Inc., 596 F.3d 871, 874 (8th Cir. 2010) (discussing Title VII), and it is true that Ludlow has not come forward with such evidence.  It does not follow, however, that "no inference of retaliation is possible."  (Def.'s Br. at 15, ECF No. 63.)  A plaintiff can establish pretext by showing that a prohibited reason, rather than the employer's stated reason, actually motivated the termination.  E.g., Torgerson v. City

---

of Family Services, 188 F.3d 932, 937 (8th Cir. 1999)).  But see, e.g., Barber v. C1 Truck Driver Training, LLC, 656 F.3d 782, 795 (8th Cir. 2011) ("An employer can certainly choose how to run its business, including not to follow its own personnel policies regarding termination of an employee or handling claims of discrimination, as long as it does not unlawfully discriminate in doing so." (citation and internal quotation marks omitted)).  Also, I agree with Ludlow that there is a genuine issue whether he was terminated in violation of the policy. Nevertheless, BNSF argues persuasively that in this case, BNSF's alleged failure to follow the Exempt Performance Management Policy has not been shown to have any connection with retaliation.  (See Def.'s Reply Br. at 34, ECF No. 72.) In short, I do not consider the policy, or BNSF's failure to adhere to it in Ludlow's case, to be evidence of pretext.

of Rochester, 643 F.3d 1031, 1047 (8th Cir. 2011) (en banc) (discussing Title VII).
For the reasons set forth previously, I find that a reasonable trier of fact could
conclude that Ludlow's termination was actually motivated by retaliation.

Finally, BNSF argues that Shewmake had a good faith belief that Ludlow
engaged in the conduct for which he was terminated, and the court cannot second-
guess the basis, wisdom, or fairness of his decision.  (Def.'s Br. at 15-16, ECF No.
63.  See also Def.'s Reply Br. at 32-33, ECF No. 72.)  Because there is evidence that
Shewmake was used as a cat's paw by subordinates seeking to terminate Ludlow in
retaliation for his protected activity, and because Shewmake's decision was based in
part on allegedly false information supplied by those subordinates, I am not
persuaded that Shewmake's good faith reliance on his subordinates shields BNSF
from liability.

In conclusion, I find that genuine issues of fact prevent entry of summary
judgment on Ludlow's NFEPA retaliation claim.  It merits emphasis that I do not find
that Wunker, Renney, Cannon, or anyone else at BNSF acted criminally.  I find only
that the record contains evidence that, when viewed in a light favorable to Ludlow,
could reasonably support the conclusion that Ludlow was terminated in retaliation for
opposing supervisors' unlawful orders to "stand down" from pursuing and assisting
in a criminal investigation.

### B.  Termination in Violation of Public Policy

BNSF argues that it is entitled to summary judgment on Count II of Ludlow's
complaint because Ludlow "has not identified any clear public policy of the State of
Nebraska . . . nor any statute restricting BNSF's common-law right to discharge him
as an at-will employee."  (Def.'s Br. at 17, ECF No. 63.)  It adds that Ludlow's public
policy claim "fails for the same reasons as his FEPA claim discussed . . . above."  (Id.

at 18.  <u>See also</u> Def.'s Reply Br. at 37, ECF No. 72.)

"The clear rule in Nebraska is that unless constitutionally, statutorily, or contractually prohibited, an employer, without incurring liability, may terminate an at-will employee at any time with or without reason."  <u>Wendeln v. The Beatrice Manor, Inc.</u>, 712 N.W.2d 226, 238 (Neb. 2006) (citing <u>Jackson v. Morris Communications Corp.</u>, 657 N.W.2d 634 (Neb. 2003)).  Nevertheless, the Nebraska Supreme Court recognizes "a public policy exception to the at-will employment doctrine."  <u>Id.</u> (citation omitted).  Under the public policy exception, an employee may "claim damages for wrongful discharge when the motivation for the firing contravenes public policy."  <u>Id.</u> (citation omitted).  The scope of the public policy exception is limited, however, to "exceptions created by statute or to those instances where a very clear mandate of public policy has been violated."  <u>Id.</u> (quoting <u>Ambroz v. Cornhusker Square Ltd.</u>, 416 N.W.2d 510, 515 (Neb. 1987)).

"The Legislature articulates public policy when it declares certain conduct to be in violation of the criminal law."  <u>Wendeln</u>, 712 N.W.2d at 239 (citations omitted).  Thus, when an employee is faced with the choice of either complying with the law and being terminated, or violating the law and being prosecuted, the public policy exception applies.  <u>See id.</u> (discussing <u>Hausman v. St. Croix Care Center</u>, 571 N.W.2d 393 (Wis. 1997)).  The exception also applies when an employee is terminated for refusing to comply with his employer's unlawful request.  <u>See Ambroz v. Cornhusker Square, Ltd.</u>, 416 N.W.2d 510 (Neb. 1987).   The public policy exception will not protect an employee from discharge, however, "for 'merely engaging in praiseworthy conduct consistent with public policy.'"   <u>Wendeln</u>, 712 N.W.2d at 239 (quoting

Hausman, 571 N.W.2d at 397).[8]

Ludlow argues that the public policy exception protects him from termination for resisting his employer's efforts "to prevent him from providing information to a criminal investigation" in violation of Revised Statutes of Nebraska § 28-919(1)(b). (Pl.'s Response Br. at 33, ECF No. 68.)  As explained in Part III.A above, I agree with Ludlow that there is a genuine issue whether BNSF did, in fact, terminate him for violating its orders that he "cease and desist" assisting in the criminal investigation of Fernandes' alleged forgery.  Although Ludlow concedes that the Nebraska Supreme Court has not extended the public policy exception to the specific facts presented here, he submits that such an extension would follow reasonably from the court's decision in Schriner v. Meginnis Ford Co., 421 N.W.2d 755 (Neb. 1988).

In Schriner, the Nebraska Supreme Court held that "an action for wrongful discharge lies only when an at-will employee acts in good faith and upon reasonable cause in reporting his employer's suspected violation of the criminal code."  421 N.W.2d at 759 (emphasis added).  As BNSF correctly notes, here there is no evidence that Ludlow "ever complained to anyone at BNSF or otherwise of Mr. Wunker's and Mr. Renney's conduct generally, or more specifically reported their conduct as potential criminal conduct to anyone."  (Def.'s Reply Br. at 37, ECF No. 72.)  Thus, the instant case does not fall within the scope of the rule stated in Schriner. Nevertheless, after careful consideration, I find that the Nebraska Supreme Court would likely conclude that Ludlow's claim falls within  the public policy exception.

Like the plaintiff in Schriner, Ludlow does not ask the court to declare public

---

[8] A concise review of the various cases in which Nebraska courts have applied the public policy exception appears in Gomez v. Cargill, Inc., No. 4:06CV3181, 2006 WL 3257184, at *1 (D. Neb. Nov. 9, 2006).

policy; rather, his theory raises the question of whether, given the enactment of § 28-919(1)(b), "there exists such a clear declaration by the Legislature of important public policy as to warrant a judicial determination that the policy is to be enforced by recognizing a cause of action for wrongful discharge under appropriate facts." Schriner, 421 N.W.2d at 759.  Because the Legislature has declared tampering with witnesses to be a Class IV felony, I find that § 28-919 represents a clear declaration of important public policy that should be enforced by allowing a cause of action for wrongful discharge to proceed "under appropriate facts."  Schriner, 421 N.W.2d at 759.  The more difficult question, it seems to me, is whether "appropriate facts" exist here, given the lack of evidence that Ludlow reported BNSF's alleged obstruction of justice to anyone.  In other words, I must determine whether, by deciding to speak with the investigator despite BNSF's "cease and desist" instructions, Ludlow merely engaged in "praiseworthy conduct consistent with public policy," Wendeln, 712 N.W.2d at 239, or whether his conduct warrants protection under the public policy exception to the at-will employment doctrine.

Viewing the evidence in a light favorable to Ludlow, it is reasonable to conclude that Ludlow was faced with the choice of speaking with the officers investigating the forgery and risking termination, or acquiescing in his supervisors' directions that he not to speak with the officers.  Unlike the plaintiff in Wendeln, there is no indication that Ludlow faced prosecution for following his supervisors' directions.  In other words, he was not commanded, instructed, or requested "to violate public policy as established in existing law." Hausman, 571 N.W.2d at 396-97.  Significantly, however, there is evidence that he was given orders that inherently violated the public policy expressed in § 28-919(1)(b).  In this respect, the facts of this case are analogous to those in Ambroz v. Cornhusker Square Ltd., 416 N.W.2d

41

510, (Neb. 1987). In <u>Ambroz</u>, the plaintiff's employer demanded that he take a polygraph examination, and the plaintiff was terminated after he refused to do so. The Nebraska Supreme Court found that the plaintiff's discharge violated "the pronouncement of public policy" set forth in the Nebraska Licensing of Truth and Deception Examiner's Act, Neb. Rev. Stat. §§ 81-1901 <u>et seq.</u>, which states, "No employer or prospective employer may require as a condition of employment or as a condition of continued employment that a person submit to a truth and deception examination unless such employment involves public law enforcement."   <u>See</u> 416 N.W.2d at 513 (quoting Neb. Rev. Stat. § 81-1932).   It does not appear that the plaintiff faced prosecution for complying with his employer's demand to take the examination; nor is there evidence that he took any action apart from refusing to comply.  Nevertheless, the employer's demand violated the public policy expressed in § 81-1932, and therefore the plaintiff's termination for refusing to comply violated "a clear, statutorily mandated public policy."  416 N.W.2d at 515.  Similarly, there is evidence that Ludlow was given orders that violated the public policy declared in § 28-919(1)(b), and he was terminated after he refused to follow those instructions. Thus, in light of <u>Ambroz</u>, it is likely that the Nebraska Supreme Court would recognize Ludlow's public policy claim insofar as it is based on § 28-919(1)(b).

Ludlow also claims that "he was wrongfully terminated in violation of public policy for reporting the forgery" allegedly committed by Fernandes.  (<u>See</u> Pl.'s Response Br. at 34, ECF No. 68.)  The focus here is not on Ludlow's communications with investigators after he was instructed by his supervisors to "stand down," but rather on his initial reports to the VA and BNSF police about the forgery.  (<u>See, e.g.</u>, <u>id.</u> at 31, 34-38, ECF No. 68.)  Once again, "Ludlow concedes that Nebraska has not extend[ed] the public policy exception to those individuals who report the fraud of

42

their co-workers," but he submits that such an extension is appropriate under Schriner. (Id.)

In support of his argument, Ludlow refers me to the Nebraska Supreme Court's discussion of Palmateer v. International Harvester Co., 421 N.E.2d 876 (Ill. 1981). See Schriner, 421 N.W.2d at 758. The Nebraska Supreme Court stated, "In applying a public policy exception to the termination-at-will rule, the Illinois Supreme Court, in Palmateer v. International Harvester Co., . . . observed that there is no public policy more basic than the enforcement of a state's criminal code. It therefore held that one claiming to have been discharged because he had informed law enforcement officers that an unnamed coemployee might be violating the criminal code in an unspecified manner, and had agreed to gather further evidence and to testify if a trial were held, stated a cause of action." Id.

There can be little doubt that the Nebraska Supreme Court has adopted Palmateer's reasoning that the state's criminal code is a source for clear declarations of public policy sufficient to justify applying an exception to the at-will employment doctrine. The court has not yet provided any indication, however, of willingness to adopt the sort of wide-ranging whistleblower exception described in Palmateer. On the contrary, in Wendeln the Nebraska Supreme Court expressed approval of Wisconsin's more narrow rule that employees are not protected from discharge for "merely engaging in praiseworthy conduct consistent with public policy." 712 N.W.2d at 239 (quoting Hausman, 571 N.W.2d at 397). See also Hausman, 571 N.W.2d at 397 (specifically rejecting the "inclusive whistleblower exception" adopted in Palmateer and other cases).

It is true that BNSF's code of conduct required Ludlow to report violations of the law to officials within the company. (See Pl.'s Index, Ex. M, ECF No. 69-2.)

43

BNSF's code of conduct does not represent a clear statement of public policy sufficient to justify an exception to the at-will employment doctrine, however. I find that because there is no evidence that Ludlow had any legal duty to report Fernandes' alleged forgery, his making of the report –though praiseworthy and consistent with public policy–is not protected under Nebraska's public policy exception to the at-will employment doctrine. Thus, BNSF is entitled to summary judgment on Count II to the extent that it is based on Ludlow's reports of Fernandes' alleged forgery (as opposed to BNSF's alleged violation of § 28-919).

**IT IS ORDERED** that BNSF Railway Company's Motion for Summary Judgment, ECF No. 62, is granted in part. As explained in the memorandum accompanying this order, BNSF is entitled to summary judgment on Count II of the complaint insofar as it is based on the theory that Ludlow was terminated in violation of public policy for reporting a coworker's forgery. In all other respects, the motion for summary judgment is denied.

Dated July 24, 2013.

BY THE COURT

Warren K. Urbom
United States Senior District Judge

44